UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFC REALTY CAPITAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SUNDEEP S. DALE; ROHIT RANCHHOD; DALE INVESTMENTS, LLC; SUNDEEP DALE, LLC; CALIFORNIA FRUIT BUILDING, LLC; and AMERICAN HOSPITALITY SERVICES, INC.,<br><br>Defendants. | Case No. 2:18-cv-02389-MCE-JDP<br><br>**MEMORANDUM AND ORDER** |

Through the present lawsuit, Plaintiff AFC Realty Capital, Inc. ("Plaintiff" or "AFC") seeks payment of a commission fee it claims is owed under a contract between Plaintiff and Defendants Sundeep S. Dale ("Dale"); Rohit Ranchhod ("Ranchhod"); Dale Investments, LLC; California Fruit Building, LLC; and American Hospitality Services, Inc. (collectively "Defendants") for the provision of construction financing to renovate a building in Sacramento, California being converted into a boutique hotel.  When Defendants failed to pay Plaintiff its commission fee under the terms of that contract once financing was secured, Plaintiff sued, alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

1

Now before the Court is Defendants' Motion for Summary Judgment, or in the alternative, Partial Summary Judgment. ECF No. 50. That Motion prompted Plaintiff, in turn, to both submit opposition and to file its own cross-motion for summary judgment (ECF No. 59). For the reasons set forth below, Defendants' Motion is DENIED, and Plaintiff's Motion is GRANTED.[1]

## BACKGROUND

Plaintiff AFC is a New York-based company. Arthur Fefferman ("Fefferman") is AFC's president and sole employee. Defs.' Statement of Undisputed Fact ("DUF"), ECF No. 50-2, No. 4. AFC specializes in hotel industry financing and is widely regarded as having special expertise in arranging financing for entities looking to transition properties into the hotel market. Plaintiff's First Amended Complaint ("FAC"), ECF No. 16, ¶ 4; Fefferman Decl., ECF No. 59-1, ¶¶ 2, 4. Fefferman is a licensed real estate broker in the State of New York and conducts the majority of his business by telephone and email from AFC's New York office. Fefferman Decl., ¶¶ 13-14.

Dale is a California citizen and the principal (and owner together with his wife) of Dale Investments, LLC, a California-based company. Dale has worked at least ten years in the commercial real estate business. He established Dale Investments to buy, hold and/or sell real estate and that company, in turn, owned some 10 to 12 other business entities. Dale Dep., 19:3-7; 23:23-24:6. One of those wholly-owned entities, California Fruit Building, LLC, was formed to purchase, renovate and convert the historic California Fruit Building (located in Sacramento, California) into a 101-room Hilton-branded boutique hotel (the "Conversion Project").

Ranchhod is a California citizen and the President of the California-based company American Hospitality Services, Inc., whose business is hotel development,

---

[1] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

2

1  management, and operations. Ranchhod Dep., 9:22-10. Ranchhod and his company
2  helped Dale manage the Conversion Project and had a contract with Dale to run the
3  hotel once completed. Ranchhod Dep., 19-20. Dale described the relationship between
4  American Hospitality Services, Inc. and Dale Investments, LLC as that of a "joint
5  venture" for that purpose. Dale Decl., ¶ 6.
6      In order to help secure the needed financing for the Conversion Project,
7  Ranchhod introduced Dale to Fefferman and AFC. Significantly, Ranchhod had
8  successfully worked with Fefferman on about five prior hotel financing deals. Ranchhod
9  Dep., 22:12-16, 10:12-23; 29:14-20. Dale was looking for someone familiar with hotel
10  conversions and admits that Fefferman "knew the business." Dale 28:7-14; 54:1-6.
11  Consequently, around June 2017, Defendants contacted Fefferman in New York, asking
12  him to investigate and secure financing for the Conversion Project.
13      On July 11, 2017, the parties entered into a written letter agreement in which
14  Plaintiff agreed to arrange first mortgage construction financing for the Conversion
15  Project (the "Agreement"). DUF No. 14. Dale, who made the ultimate decision to hire
16  AFC, knew that Fefferman's office was in New York, and the AFC letterhead on which
17  the Agreement was drafted included both a New York address and telephone number.
18  Dale Dep., 5:10-13.
19      Under the terms of the Agreement, AFC had "the exclusive right and authority to
20  arrange on [Defendants'] behalf financing on such terms and conditions" as were
21  acceptable to AFC. DUF No. 15. Defendants agreed to refrain from entering into any
22  loan application/commitment with any lender besides AFC for an initial period of 90 days
23  and thereafter until cancelled in writing. Agreement, Ex. A. to Dale Decl., ECF No. 50-3,
24  ¶ 1. The Agreement further provided that Plaintiff was to be paid 1.65% of the loan
25  commitment amount, which was to be earned upon Defendants' acceptance of a Loan
26  Commitment on Term Sheet issued by the lender. The Agreement states:
27  ///
28  ///

> 2. In consideration of our services for arranging such a loan, you agree to pay AFC a fee equal to 1.65% of the loan commitment amount. Our fee shall be deemed earned upon acceptance by you of a Loan Commitment or Term Sheet issued by the Lender and be payable at closing.

Agreement, ¶ 2.

The Agreement further authorized the Lender to withhold AFC's fee from the loan closing proceeds and disburse the fee directly to AFC. Id. at ¶ 3. Moreover, the Agreement makes it clear that even if Defendants terminate the authorization granted to AFC to secure financing on their behalf, AFC's fee remains payable, even if the loan commitment has not been accepted, as long as the application for same was made prior to the termination date. Id. at ¶ 5. Additionally, as already indicated above, not only was the Application drafted on AFC letterhead with a New York address and telephone number, the Application specifically provides that it is "negotiated in and shall be governed by and subject to the laws of the State of New York." Id. at ¶ 6. The Agreement, prepared on July 7, 2017, was "agreed and accepted" by Dale and Ranchhod four days later, on July 11, 2017. Id. at p. 2.

Once retained, AFC prepared the Project Overview and Financing Report (the so-called loan offering memorandum) needed to solicit funding. That involved gathering and analyzing not only information concerning Dale's financial holdings and interest, but also a market analysis of the Conversion Project that included an assessment of the income potential of the renovated building as an operated hotel, along with projected costs to complete the project for that purpose. AFC then circulated the loan offering memorandum to potential lenders willing to offer non-recourse funding in an amount not less than $20,500,000. Fefferman Decl., ECF No. 59-1, ¶ 12. Fefferman subsequently held in-depth discussions with multiple lenders and made presentations to facilitate and further dialog about the proposed loan. DUF Nos. 20, 22

After Stonehill Strategic Capital, LLC ("Stonehill") was identified as a likely funding source, Fefferman also participated in multiple additional phone calls to Stonehill and provided substantial additional information, including pro formal financials, trend reports,

1  detailed construction and project costs, general contractor and architect data, and
2  schematics and plans along with market statistics.  Fefferman also communicated with a
3  potential appraiser and gave that information to Stonehill.  See DUF Nos. 23-28.
4       Importantly, Fefferman claims all this work, including phone calls and email, was
5  done out of his New York office.  Fefferman Decl., ¶ 13.  Although Fefferman admits that
6  he travelled to California once in July 2017 and toured the California Fruit Building, he
7  states he solicited no lenders while in California or did any work requiring a California
8  license while in California.  Id. at ¶ 14.  Ranchhod does not even recall that visit; Dale
9  remembers only having dinner after visiting the California Fruit Building.   Ranchhod
10 Dep., 36:19-22; Dale Dep., 37:25-38:10.
11      As a result of his efforts on Defendants' behalf, Fefferman secured financing from
12 Stonehill.  As set forth in a Term Sheet dated August 23, 2017, Stonehill offered a
13 $22,150,00 construction loan for the Conversion Project.  Dale Decl., Ex. F.  The Term
14 Sheet was accepted by Dale, as managing agent for California Fruit Building, LLC.  Id.  It
15 called for an initial payment deposit in the amount of $55,000, to be made
16 simultaneously with submission of the Loan Term Sheet , for reimbursement of
17 Stonehill's out-of-pocket third-party costs and legal fees and expenses associated with
18 the financing.  Id. at p. 10.
19      Fefferman continued to provide assistance even after the Loan Term Sheet was
20 executed.  He provided the appraiser, Cushman and Wakefield, with the information
21 needed to perform an accurate evaluation in January of 2018.  In addition, when Dale
22 asked to obtain a copy of the appraisal report issued on January 25, 2018, Fefferman
23 complied.  Fefferman Decl., ¶¶ 18-20.
24      Unbeknownst to Fefferman, and even though Defendants never terminated the
25 Agreement with AFC, Dale submitted pro forma financials and appraisal values to
26 another lender, Farm Credit West.  Thereafter, on May 9, 2018, Dale sent Farm Credit
27 West the Cushman and Wakefield appraisal with instructions that its production be kept
28 "confidential."  See Carman Decl., ECF No. 59-2, Ex. D.

  Defendants told AFC, on or about July 19, 2018, that they were terminating the financing procured through Stonehill, and Fefferman later learned Defendants had in fact obtained their financing for the Conversion Project through Farm Credit West. Thereafter, Fefferman made both written and oral demands, as recently as August 8, 2018, that AFC be paid, in accordance with the Agreement, for its earned fee in the amount of $365,474.00 ($22,150,000 x 1.65%). Defendants' failure to do so prompted Plaintiff to file the instant lawsuit on August 30, 2018.

  Fefferman states he spent more than 200 hours "working to provide [Defendants] with advisory financial advice, hotel construction related guidance, location oriented insight and projected profitability analysis" to both demonstrate the utility of pursuing the Conversion Project and to contact prospective lenders and industry colleagues he developed over his more than 40 years of experience in the field. Fefferman Decl., ¶ 23. Fefferman claims Defendants took advantage of both that expertise and the benefits he provided under the Agreement without ever registering a single complaint about his work. Id. at ¶ 25. According to Fefferman, Dale "simply took all [his] work and went to Farm Credit in order to avoid paying the contractual obligations he owed to AFC." Id.

  Defendants filed the Motion for Summary Judgment now before the Court on July 9, 2021. Defendants do not argue that Fefferman and AFC did not earn their fee under the terms of the Agreement, or provided substandard work. Instead, Defendants simply claim that no commission is payable since Fefferman, acting on behalf of AFC, was not a licensed California real estate broker in accordance with the state's Business and Professions Code. Alternatively, Defendants argue that the Agreement is unenforceable because it is premised on an illegal brokerage agreement which cannot be enforced under California law given Fefferman's lack of California licensure. See DUF No. 5.

  Plaintiff not only opposes Defendants' motion but brings its own cross-motion for summary judgment, asserting that because California only requires licensure for brokerage activities performed "within" California, the fact that Fefferman did all his work

outside the state (in New York) makes the California licensing statutes inapplicable to the activities at issue here. Plaintiff claims that the Agreement by its explicit terms obligates Defendants to pay his commission fee, and it seeks summary judgment accordingly.[2]

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

///

---

[2] The Court notes Defendants' argument that Plaintiff's cross-motion should be deemed untimely because Plaintiff's request for a filing extension in response to Defendants' motion extended only to the time within which an opposition could be submitted, and therefore according to Defendants should not apply to a cross-motion submitted along with the opposition. Defendants' position is wrong for two reasons. First, the operative Pretrial Scheduling Order requires, absent leave of court, that all issues the parties wish to resolve on summary judgment be raised in one motion or cross-motion (ECF No. 3, p. 4), which means that any cross-motion must ordinarily be submitted along with the opposition. Therefore, any affirmative "consent" to the filing of a cross-motion independent from the opposition is not indicated. Secondly, as Plaintiff points out, their deadline for filing a dispositive motion on their own, had they sought leave to do so, had not yet expired in any event under the terms of the same Scheduling Order. For all these reasons, Defendants' objections to the timeliness of Plaintiff's cross-motion are OVERRULED.

7

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus., Ltd. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

As indicated above, Defendants' asserted entitlement to summary judgment depends on the validity of their argument that because Plaintiff's principal, Fefferman, was not a licensed California broker, "Plaintiff is therefore precluded from any claims for any payment of the broker's commission it now demands." Defs.' Mot., ECF No. 50-1, 3:11-12. Defendants argue that in the absence of an enforceable broker's commission contract under California law, they are entitled to summary judgment both as to Plaintiff's claims for breach of contract and its related cause of action for breach of the implied covenant of fair dealing. Id. at 14-18. Significantly, Defendants' papers make no assertion that Plaintiff was not entitled to compensation assuming the Agreement was valid, or that Plaintiff's performance pursuant to the Agreement was in any way deficient. Plaintiff's opposition to the defense motion, as well as its own cross-motion seeking summary judgment, takes aim at the fundamental premise of the defense argument that Fefferman's work procuring financing for the Conversion Project required that he be a licensed California broker.

In analyzing the merit of these divergent positions, the Court first turns to the California statutory framework relied upon by Defendants in arguing that Plaintiff's

lawsuit to obtain its commission payment under the Agreement cannot be maintained. California Business and Professions Code § 10130 makes it unlawful for an individual to act as a real estate person "within" California without the appropriate license, stating in pertinent part as follows:

> It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker . . . within this state without first obtaining a real estate license from the department . . .

Cal. Bus. & Prof. Code § 10130. Section 10136 goes on to prohibit any lawsuit seeking compensation as a broker acting "within" the state absent such licensure:

> No person engaged in the business or acting in the capacity of a real estate broker . . . within this state shall bring or maintain any action in the courts of this state for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he or she was a duly licensed real estate broker or real estate salesperson at the time the alleged cause of action arose.

Id. at § 10136.

The obvious question that arises given the context of the case at bar is whether Fefferman's activities were conducted "within" California so as to bring them within the purview of these statutes. As the factual background section above makes clear, Fefferman's declaration states plainly that "all of my work to locate a potential lender for the conversion project was performed out of my New York office . . . [including] phone calls and the use of email." Fefferman Decl., ECF No. 59-1, ¶ 13. Plaintiff also points out that because Defendant Ranchhod had worked with Fefferman on at least five prior hotel financing deals, Defendants knew or should have known that Fefferman operated in New York, and both Ranchhod and Dale admit they sought out Fefferman's services because of his expertise in hotel conversion financing.

Defendants make no effort to cast doubt on any of the above or to offer any evidence that Fefferman did any of the work on the project "within" California.[3] Instead,

---

[3] As indicated above, the only activity Fefferman arguably did within California was to visit the California Fruit Building site one day in Sacramento and have dinner with Ranchhod and Dale thereafter. Fefferman claims, however, that he did no work soliciting lenders in California, and Defendants make no

they argue only that because the subject of the financing, the California Fruit Building Conversion Project, was located within California and because both Dale, Ranchhod and their associated companies were California-based, Fefferman's efforts must necessarily be deemed to have occurred "within" California for purposes of the subject regulatory statutes.

The Ninth Circuit's decision in Consul Ltd. v. Solide Enterprises, Inc., 802 F.2d 1143 (9th Cir. 1986) is dispositive in resolving the fundamental issue as framed by both sides in their respective motions. Consul, like the present case, involved an out-of-state corporation (North Carolina as opposed to New York here), with a president, Wilson, who was licensed as a real estate broker in North Carolina and several other states, but not California. The parties entered into brokerage/agency agreements related to the sale of two California properties and a property located in the Bahamas. Consul and Wilson sued when the Defendants allegedly tried to make sales that violated the exclusive nature of the agreements. The district court dismissed their complaint, reasoning that because plaintiffs had no California broker's license, they could not maintain an action for breach of contract since the agreement to provide brokerage services was illegal under California law. Id. at 1145-46.

Under these circumstances, which are virtually on all-fours with the present case, the Ninth Circuit reversed, finding that there was "nothing in the complaints that indicates that plaintiffs performed any regulated acts in California," and noting that the Business and Professions Code licensure requirements "apply only to acts performed within California." Id. at 1151-52. The court explained that because no California case had decided the issue present in both that case and here; namely, "whether the California licensing statutes apply to out-of-state acts relating to in-state (California) realty performed by a broker licensed in another state,"[4] and because the California "statutes

---

real argument that coming to Sacramento on that single occasion brought Fefferman's work "within" California for purposes of triggering the regulatory statutes.

[4] There is no dispute that Fefferman is a broker licensed under the laws of New York.

refer to acts within the state," it was "hesit[ant] to ignore this plain language." Id. at 1149-50.

Significantly, in reaching this conclusion, the Consul court also looked for guidance from courts in other jurisdictions in determining how California would decide the issue in the absence of clear authority. It found that "[a]ll relevant authority suggests that licensing schemes like California's do not apply to out-of-state activities regarding in-state land." Id. at 1150. It also noted case law finding "no interference with the public policy of the state in which the broker is not licensed [here, California] in allowing recovery for services performed out of state" [by Fefferman in New York in the case at bar]. Id.

Since there is no dispute that all relevant work was performed by Fefferman in New York, where he had a broker's license, and not in California, Consul thus stands for the proposition that the California licensing statutes are not implicated even if the out-of-state work happens to involve a California property. Defendants' attempt to distinguish Consul on grounds that the present matter involves both California real estate and California defendants is unavailing. That argument is undercut by the fact that the defendants in Consul included both an individual domiciled in California and at least three California corporations. Id. at 1145 and n.1.

Having determined that Defendants' attempt to skirt its payment obligations under the Agreement (by virtue of Fefferman not being a licensed California broker) fail, we next look to the provisions of the Agreement itself. The Agreement, as delineated, above, obligates Defendants Dale and Ranchhod, as signatories, to pay Plaintiff "a fee equal to 1.65% of the loan commitment amount . . . [which] shall be deemed earned upon acceptance by you of a Loan Commitment or Term Sheet issued by the Lender." Agreement, Ex A to Dale Decl., ¶ 2. While both Ranchhod and Dale tried to argue that

///
///
///

Fefferman was not owed anything until the loan closed and his fee was paid out of escrow, that is not what the Agreement says.[5]

It is uncontroverted that, through Plaintiff's efforts, Stonehill delivered a document specifically denominated in the first sentence as a "Term Sheet" in bold letters. Dale Decl., Ex. F. It is equally undisputed that the Term Sheet specifies a loan amount of $22,150,000, and that it was signed by Dale in his capacity as managing member of the California Fruit Building LLC. Id. Consequently, given the acceptance of the Term Sheet, Defendants Dale and Ranchhod were obligated under the terms of their Agreement to pay the agreed-upon 1.65% commission, which computes to the sum of $366,475.00 given the loan amount.

There is no evidence that this commission structure was either unfair or unreasonable in the commercial real estate financing business. Defendants' failure to pay Plaintiff that amount is a breach of the Agreement and Plaintiff is entitled to its commission, plus interest, pursuant to Plaintiff's claim for breach of contract.

As a final matter, it bears noting that Defendants' attempt to paint Fefferman as an incompetent "broker with respect to California real estate law" (see Defs.' Reply, ECF No. 65, 3:6-7) is not supported by any facts in the record. To the contrary, all the evidence before the Court is that Fefferman had substantial expertise in the hotel conversion financing business and was targeted by Defendants to work on their project because of that expertise, in addition to his prior successful corroborations with Ranchhod. The contractual obligation at issue here was sought out, negotiated, and secured with an entity Defendants knew was located and worked out of New York. While the California licensing statutes were enacted "to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners" (Greenlake Capital, LLC v. Bingo Investments, LLC, 185 Cal. App. 4th 731, 736 (2010), there is absolutely no evidence of any such legitimate concern here. Fefferman was an

---

[5] While the Agreement does state that Plaintiff's fee is "payable at closing," the previous clause makes it clear that it is in fact earned upon acceptance of the Loan Commitment or Term Sheet. Id.

acknowledged expert in his field and Defendants, with their considerable joint experience in property investment and hotel management, respectively, were hardly unsophisticated consumers. Moreover, as indicated above, Defendants' papers do not allege the work and guidance provided by Fefferman in securing financing was improper or wrong.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 50) is DENIED, and Plaintiff's Cross-Motion (ECF No. 59) is GRANTED. Having established that Defendants breached their contract with Plaintiff, Plaintiff is entitled to the $365,474.00 it requests, calculated pursuant to the formula provided by the subject Agreement, plus statutory interest from the date of breach.[6]

IT IS SO ORDERED.

Dated:  June 16, 2022

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE

---

[6] While Plaintiff also includes an additional cause of action for breach of the implied covenant of good faith and fear dealing in connection with its breach of contract, it seeks no additional damages in connection with that claim. Moreover, with respect to Plaintiff's third and final cause of action, for restitution based on unjust enrichment, Plaintiff indicates that claim is pled as an alternative to recovery on a breach of contract basis (see Pl.'s Cross-Motion, ECF No. 59, pp. 16-17), and since such contractual damages are being awarded, the Court need not address Plaintiff's restitution theory and declines to do so.